# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WARREN D. ANDERSON, | |
| Plaintiff, | CIVIL ACTION NO. 1:15-cv-00878 |
| v. | (KANE, J.)<br>(SAPORITO, M.J.) |
| DAUPHIN COUNTY ADULT PROBATION OFFICE, et al., | |
| Defendants. | |

## REPORT AND RECOMMENDATION

This is a *pro se* federal civil rights action. The plaintiff claims that the remaining defendant, Dauphin County Probation Officer Tom Walton, violated his civil rights when he allegedly applied excessive force after his arrest on drug possession and other charges. Walton filed a motion for summary judgment and an amended motion for summary judgment. (Doc. 62; Doc. 67). For the reasons expressed below, it is recommended that the motions be granted.

I. **Statement of the Case**

On May 6, 2015, the Court received and filed the *pro se* complaint, signed and dated by the plaintiff on April 27, 2015. (Doc. 1). At the time, Anderson was incarcerated at SCI Camp Hill, located in Cumberland County, Pennsylvania.

In his complaint, Anderson has asserted Fourth Amendment

unreasonable search and excessive force claims and an Eighth Amendment excessive force claim, all pursuant to 42 U.S.C. § 1983. He has also asserted supplemental state law claims for unreasonable search and seizure under the Pennsylvania state constitution and official oppression under a Pennsylvania criminal statute. Anderson seeks an award of compensatory and punitive damages from the defendants. He does not request declaratory or injunctive relief.

On January 25, 2016, we issued a report recommending that all defendants except Walton, be dismissed for failure to state a claim. (Doc. 48). We recommended that only Anderson's Fourth Amendment excessive force claim against Walton be permitted to proceed. (*Id.*). Our report and recommendation was adopted by the Honorable Yvette Kane on February 26, 2016. (Doc. 50).

The complaint alleges that, on the afternoon of May 17, 2013, officers from the Dauphin County Adult Probation Office, the Dauphin County Sheriff's Department, and the Lower Paxton Police Department sought to execute an arrest warrant on an individual named Kevin Ramos, a white Hispanic male, whom they believed to reside at 2308 Orange Street in Harrisburg, Pennsylvania, the home where Anderson

2

resided. Anderson alleges that Ramos did not live there, nor was he present at the time.

One of the officers knocked on the front door. A black male, later identified as Ronnie Daniels, opened the front door, saw the several police officers outside, and attempted to close the door. The officers kicked in the front door and immediately detained Daniels in the home's living room, handcuffing him and directing him to sit on a couch while the officers searched for Ramos.

When officers searched upstairs, they found Anderson, also a black male, in the bathroom, where the officers later claimed to have found him flushing marijuana down the toilet. However, none of the officers, including Walton, actually saw Anderson flushing marijuana or any other drugs down the toilet. (Doc. 68-4). Officer Sean W. Reed stated in his affidavit that he and Officer Daniel Smeck "believed" that Anderson was flushing narcotics down the toilet. (*Id*. at 5). Officer Smeck stated in his affidavit that as he entered the home, Anderson was "discovered" in the second floor bathroom flushing illegal narcotics down the toilet. (*Id*. at 7). Obviously, Smeck cannot simultaneously witness Anderson flushing narcotics down the toilet on the second floor

3

of the home as Smeck entered the home on the first floor. Officer Brandon Rigel stated in his affidavit that he was "informed" that Anderson was in the second floor bathroom flushing illegal narcotics down the toilet. (*Id.* at 3). Walton stated in his affidavit that he was in the back yard of the home when Anderson was allegedly discovered in the second floor bathroom. (*Id.* at 1).

Anderson let the officers in the bathroom, allowed them to search him, and was handcuffed in the upstairs hallway and taken downstairs, where he too was instructed to sit on the couch. (*Id.* at 57-58; Doc. 68-3, at 49). Walton apparently believed that Anderson had something in his mouth and used a Taser to shock Anderson and force him to spit it out. However, in his affidavit, Walton stated that "as Anderson was detained it became obvious that he placed illegal narcotics in his mouth in an effort to either swallow or secrete the illegal drugs." (Doc. 68-4, at 1). Walton's affidavit is silent on the facts supporting how it "became obvious" that Anderson secreted illegal narcotics in his mouth. Moreover, the other officers who submitted affidavits in support of Walton's motion made the identical statement without further explanation regarding the alleged obviousness of Anderson secreting

narcotics in his mouth.[1] The officers stated they recovered several small bags of drugs that had been secreted in Anderson's mouth after Walton tased him three times. (*Id.*). Neither Walton nor the officers providing affidavits in support of Walton's motion states that Anderson resisted arrest or attempted to flee. (*Id.*). Rather, Walton and the officers stated that Anderson failed to comply with Walton's directive to spit the drugs out of his mouth. (Doc. 68-4). Upon Anderson's failure to comply, Walton discharged the Taser three times into Anderson's stomach. (Doc. 68-4, at 3, 4, 6, 8). No evidence was presented by Walton to suggest that he warned Anderson of his intention to use the Taser before it was discharged the first time or warned Anderson of his intention to continue using it before discharging it on each of the second or third time. (*Id.*).

Anderson testified at his deposition that he let the officers in the bathroom and allowed them to search him. (Doc. 68-3, at 49). He testified that he was taken downstairs and placed on the couch where his cousin Rodney Daniels was sitting. (*Id.* at 29-30, 54). When questioned about Ramos, Anderson told the officers that Ramos did not

---

[1] See affidavits of Rigel, Reed, and Smeck (Doc. 68-4, at 3, 5, 7).

live there nor did he know where Ramos lived. (*Id*. at 30). Anderson refused to provide any further information about Ramos to the officers.

Anderson testified that when one of the officers said Anderson had something in his mouth, one of the officers began to choke him, preventing him from swallowing the drugs. (*Id*. at 30, 64-66). The officers instructed him repeatedly to "spit it out" (*Id*. at 64-66, 98-99). When Anderson failed to comply, Walton tased Anderson "multiple" times, until he spit the cocaine packets out of his mouth. (*Id*. at 66-72, 82, 98). (*Id*. at 31). Further, Anderson testified that Walton punched him in the ribs. The affiants stated that no one punched Anderson. (Doc. 68-4).

## II. LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving

party." Anderson, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." Anderson, 477 U.S. at 251–52.

### III. DISCUSSION

Anderson has brought this federal civil rights action under 42 U.S.C. § 1983. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

> deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983 claim, the plaintiff must establish that the defendant, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). In addition to showing a violation of a federal right committed by a person acting under color of state law, Anderson must prove that each defendant was personally involved in the alleged wrongdoing. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Id.*

Here, Anderson's claim against Walton arises out of the circumstances of his arrest on May 17, 2013. He bases this claim on Walton's use of a Taser to force Anderson to spit out items secreted in his mouth. We liberally construed Anderson's Eighth Amendment

8

claim also as a Fourth Amendment excessive force claim. *See generally Graham v. Connor*, 490 U.S. 386, 394 (1989) (noting that an § 1983 excessive force claim may be brought under either the Fourth Amendment or the Eighth Amendment); *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–46 (3d Cir. 2013) (discussing a court's obligation to liberally construe *pro se* pleadings and other submissions, particularly when dealing with imprisoned *pro se* litigants).

In the motion before us, Walton contends that: (1) Anderson has failed to prove a violation of his Fourth Amendment rights; and (2) Walton is entitled to qualified immunity.

### A. Fourth Amendment Excessive Force Claim

Anderson has asserted a Fourth Amendment excessive force claim, alleging that defendant Walton applied excessive force in using a Taser three times to shock Anderson, who was handcuffed at the time, to force him to spit out bags of drugs that had been secreted in his mouth.

Claims against police officers alleging that excessive force was used during an arrest are analyzed under the Fourth Amendment's objective reasonableness test. *Graham v. Connor*, 490 U.S. 386, 395 (1989);

*Sharrar v. Felsing*, 128 F.3d 810, 820-21 (3d Cir. 1997). The Supreme Court has identified three factors to guide the court's analysis of whether an officer's actions were objectively reasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an imminent threat to the safety of the police officers or others in the vicinity; and (3) whether the suspect attempts to resist arrest or flee the scene. *Graham*, 490 U.S. at 396. The Third Circuit has identified several additional relevant factors, including, "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effectuating an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar*, 128 F.3d at 822. Furthermore, "the fact that the physical force applied [during an arrest] was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality," the absence of physical injury does not necessarily signify that the force used was not excessive. *Id.*; *see also Velius v. Twp. of Hamilton*, 466 Fed. App'x 133, 137 (3d Cir. 2012); *Spencer v. Biggins*, No. 1:11-CV-1850, 2013 WL 5702312, at *6 (M.D. Pa. Oct. 18, 2013).

"The calculus of reasonableness must embody allowance for the fact that the police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

"The use of a Taser on a suspect who is no longer resisting arrest has been found to be unconstitutional." *Geist v. Ammary*, 40 F. Supp. 3d 467, 481 n.45 (E.D. Pa. 2014) (collecting cases); *see also Yarnall v. Mendez*, 509 F. Supp. 2d 421, 432 (D. Del. 2007) ("At least one appellate court has held that 'the gratuitous use of [a Taser] on a suspect who has already been subdued and placed in handcuffs is unconstitutional.'") (quoting *Bultema v. Benzie Cty,*. 146 Fed. App'x 28, 35 (6th Cir. 2005)). The mere fact that a suspect has already been handcuffed or was initially cooperative, however, is not dispositive of the reasonable use of a Taser if the suspect subsequently refuses to comply with the officers lawful order. *See Gorman v. Warmininster Twp.*, Civil Action No. 10-CV-6760, 2012 WL 1439076, at *5 (E.D. Pa. Apr. 26, 2012).

In the instant matter, Anderson alleges that his Fourth Amendment right "to be free from the use of excessive force" under the

United States Constitution was violated by Walton during the events outlined above. (Doc. 14). The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. "The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by the government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions . . .' " *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979) (footnote omitted, ellipses in original) (quoting *Marshall v. Barlow's Inc.,* 436 U.S. 307 (1978)). "Thus the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." *Id.* at 654.

The court finds that there exist genuine issues of material fact, and that there is evidence that Walton's use of force to coerce Anderson to spit the drugs out of his mouth was objectively unreasonable. Viewing the facts in the light most favorable to Anderson, and applying

the *Graham* and *Sharrer* factors to the alleged excessive force that occurred, *i.e.*, the use of a Taser three times by Walton on Anderson in his unsuccessful efforts to force Anderson to spit out the drugs from his mouth while Anderson was handcuffed, seated on a couch, and otherwise compliant, we find that whether Walton's actions were objectively reasonable under the circumstances is for the fact finder's determination.

### B. Walton is Entitled to Qualified Immunity

Walton has asserted that he is entitled to qualified immunity, arguing that it would not be clear to a reasonable officer that the use of a Taser to force Anderson to disgorge drugs secreted in his mouth was unlawful in light of clearly established law at the time of Anderson's arrest. Walton notes that existing case law has approved the use of Tasers to "subdue individuals who resist arrest or refuse to comply with police orders" even after being handcuffed. (Doc. 32, at 32 (citing *Brown v. Cwynar*, 484 Fed. App'x 676, 681 (3d Cir. 2012)). But neither the complaint nor the submissions offered in support of the motion suggests that Anderson resisted arrest or attempted to flee, either initially, prior to arrest or after the first and second discharges of the Taser.

13

Rather, they show merely that officers subjectively believed Anderson had something in his mouth (Doc. 1, at 5), that Walton "deployed the taser on him" (*id.*), that "Anderson was tased by probation officer Tom Walton multiple times [and] he turned the volume up high to cause more damage" (*id.* at 6), and that Anderson was handcuffed at the time (*id.* at 5, 7).

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in consideration of the circumstances presented by the particular case at hand. *Pearson v. Callahan,* 555 U.S. 223 (2009). First, the court must evaluate whether the defendant violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *abrogated in part by Pearson v. Callahan*, 555 U.S. 223 (2009); *Curly v. Klem,* 499 F.3d 199, 206 (3d Cir.

2007); *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. *Saucier*, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. *Pearson,* 555 U.S. at 232; *Saucier*, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for the purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. *Williams*, 455 F.3d at 191 (*citing Saucier*, 533 U.S. at 202). The court is not required to conduct these two inquiries sequentially, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. *Pearson*, 555 U.S. at 239-40.

After electing to submit to a voluntary search, Anderson began to answer background questions posed by the officers regarding Ramos. Then, when one of the officers believed that Anderson was secreting

15

drugs in his mouth, one of the other officers began to grab Anderson by the throat and choke him, preventing him from swallowing the drugs. Thereafter, according to Walton, he used the Taser three times on Anderson in an effort to dislodge the drugs from Anderson's mouth. (Doc. 68-4, at 2). However, at his deposition, Anderson testified he was tased multiple times. (Doc. 68-3. at 70). Regardless, Anderson has admitted that he was ordered to "spit it out" multiple times, and refused to comply. (*Id*. at 65-66, 98-99). Only after this refusal to comply did Walton use the Taser on Anderson, compelling him to spit multiple bags of cocaine out of his mouth. (*Id*. at 66-72, 82, 98).

Viewing the record in the light most favorable to the non-moving plaintiff, it is evident that Walton tasered Anderson "in furtherance of the legitimate law-enforcement activity of searching for contraband in [Anderson's] mouth to prevent him from possibly destroying it by swallowing the contraband" or from endangering his own safety. *See Sanders v. City of Dothan* , 409 Fed. App'x 285, 290 (11th Cir. 2011) (per curiam). Although it may be clearly established that the use of a Taser on a fully subdued plaintiff, who poses no threat to the safety of himself or others, is a violation of the plaintiff's rights, *see, e.g., Shultz v.*

*Carlisle Police Dep't*, 706 F. Supp. 2d 613, 622-24 (M.D. Pa. 2010), under the circumstances presented in this case, we find that "[i]t is not clearly established that a police officer is prohibited from momentarily tasering an uncooperative handcuffed arrestee who—after multiple warnings—refuses to comply with [the] justifiable law-enforcement objective" of searching Anderson's mouth to prevent him from destroying contraband or harming himself. *See Sanders,* 409 Fed. App'x at 290.

Accordingly, it is recommended that summary judgment be granted to defendant Walton on qualified immunity grounds.

## IV. RECOMMENDATION

For the foregoing reasons, it is recommended that:

    1.    Walton's motion and amended motion for summary judgment (Doc. 62; Doc. 67) be GRANTED;

    2.    The Clerk be directed to enter JUDGMENT in favor of defendant Walton and against the plaintiff; and

3. The Clerk be directed to CLOSE this case.

*s/ Joseph F. Saporito, Jr.*
JOSEPH F. SAPORITO, JR.
U.S. Magistrate Judge

Dated: April 10, 2017

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WARREN D. ANDERSON, | |
| Plaintiff, | CIVIL ACTION NO. 1:15-cv-00878 |
| v. | (KANE, J.)<br>(SAPORITO, M.J.) |
| DAUPHIN COUNTY ADULT PROBATION OFFICE, et al., | |
| Defendants. | |

# **NOTICE**

NOTICE IS HEREBY GIVEN that the undersigned has entered the foregoing Report and Recommendation dated April 10, 2017. Any party may obtain a review of the Report and Recommendation pursuant to Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo

determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to timely file objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Dated: April 10, 2017          *s/ Joseph F. Saporito, Jr.*
                               JOSEPH F. SAPORITO, JR.
                               U.S. Magistrate Judge